UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
HI BAR CAPITAL LLC,

                *Plaintiff*,

   -against-

YOEL GETTER,

                *Defendant*.
------------------------------------------------------------------X

Civil Action No. 22-cv-1743

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Hi Bar Capital LLC ("Plaintiff"), by its attorneys, Oved & Oved LLP, complaining of Defendant Yoel Getter ("Defendant"), alleges as follows:

## NATURE OF ACTION

1. In early 2021, Plaintiff's principal sought to start a cash advance business that would purchase the future receivables of cash-starved companies by providing those companies with much needed funds to use as working capital. Given that these future receivables are speculative and not guaranteed, it was, and is, of the utmost importance that Plaintiff conduct extensive due diligence and underwriting on these companies to ensure that they are likely to use the capital provided by Plaintiff to successfully operate and generate receivables such that Plaintiff would be paid.

2. Around this time, Defendant held himself out to Plaintiff's principal as having extensive experience as a broker in the cash advance industry and represented that he had a large network of contacts, both brokers and business operators, that he could utilize to bring a consistent stream of deals to Plaintiff. In March 2021, Plaintiff hired Defendant as an independent contractor to use his network, experience and skills to source deals and operate Plaintiff's day-to-day business. Plaintiff agreed to compensate Defendant by paying him a commission of 50% of net profits earned by Plaintiff.

3. While Defendant initially succeeded in bringing in a high volume of deals with strong counterparts that generated significant future receivables from which Plaintiff collected payment, Defendant's greed and insatiable need for cash to fund his grandiose, outsized and unsustainable luxury lifestyle eventually caused Defendant to bilk Plaintiff out of millions of dollars.

4. Specifically, Defendant damaged Plaintiff in excess of $10.5 million principally through four methods: (i) falsely holding himself out as an owner of Plaintiff and directing Plaintiff's customers to divert payments of least $500,000 from Plaintiff, directly to Defendant, including causing an entity he controls to operate under the assumed name of "Hi Bar Capital" – Plaintiff's legal name; (ii) causing Plaintiff to enter into over $6 million in deals with uncreditworthy companies that were about to become insolvent, knowing these companies would not generate future receivables, solely so that Defendant could collect in excess of $1 million in unearned commission payments from Plaintiff; (iii) extending and increasing transactions with existing customer-companies to make it appear as if receivables had been collected and profits had been earned to deceive Plaintiff into paying unaccrued profits to Defendant; and (iv) extorting Plaintiff into "advancing" profit share payments to Defendant upon Defendant's repeated threats to destroy and derail Plaintiff's business.

5. Accordingly, Plaintiff brings this action to recover from Defendant in excess of $10.5 million in money damages caused by Defendant's breaches, theft and other misconduct.

## PARTIES

6. Plaintiff Hi Bar Capital LLC is a New York limited liability company, whose sole member is a citizen of New York, residing in Kings County. At all relevant times, Plaintiff maintained a principal place of business in Kings County, New York.

7.  Defendant Yoel Getter, upon information and belief, is a citizen of Florida, residing at 56 Bal Bay Drive, Miami, Florida.

## JURISDICTION AND VENUE

8.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are domiciled in different states, and the amount in controversy exceeds $75,000.

9.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTS

10. On February 9, 2021, Plaintiff's principal, Yisroel Herbst ("Herbst"), formed Plaintiff with the intent to operate a cash advance business.

11. Plaintiff's business purchases the future receivables of illiquid companies to provide them with the necessary working capital to continue to operate and grow their businesses. The cash advance business can be very risky because the receivables that Plaintiff would purchase do not presently exist and may never exist, and those that do exist may never be paid, which would leave Plaintiff with a loss on its purchase.

12. Herbst had little experience in the cash advance industry and sought to hire someone with significant experience in the field to find deals and conduct the day-to-day operations of the business.

13. In or around March 2021, Defendant held himself out to Herbst as having extensive experience as a broker in the cash advance industry. Defendant represented that he had a large network of potential clients as well as other brokers such that he could immediately bring in a large number of quality deals to Plaintiff.

14. Plaintiff agreed to work with Defendant as an independent contractor. In this role, Defendant was responsible for sourcing potential deals; conducting due diligence and underwriting

on potential customer-companies to ensure that they were creditworthy, well run, and likely to generate sufficient collectible future receivables to allow Plaintiff to earn a profit; preparing deal terms; and collecting receivables for Plaintiff.

15. Plaintiff agreed to compensate Defendant by paying him a commission of 50% of all net profits earned by Plaintiff. The parties agreed that these net profits would be calculated over 3-month intervals and Plaintiff would pay Defendant his share at the end of such 3-month periods. For example, if Plaintiff paid $5 million to purchase certain future receivables between January 1 and March 31, and Plaintiff collected $7 million based on those transactions, Plaintiff would have accrued $2 million in gross profits, less expenses, resulting in a net profit amount from which 50% would be paid to Defendant once they were earned beginning on April 1.

16. Initially, Defendant appeared to perform as advertised. Defendant sourced a number of deals that Plaintiff funded by purchasing future receivables of companies that Defendant identified. These companies generated the anticipated receivables that Plaintiff had purchased, and Plaintiff was able to earn a profit upon collection and pay Defendant his appropriate portion of net profits.

17. Defendant, however, would soon begin to implement an elaborate and sophisticated scheme to swindle Plaintiff out of millions of dollars in unearned and improperly taken commission payments, while further damaging Plaintiff by deliberately causing Plaintiff to enter into transactions with uncreditworthy companies that had no realistic change of generating future receivables against which Plaintiff could collect solely so Defendant could claim Plaintiff owed Defendant commissions for "brokering" the deal.

18. When Plaintiff hired Defendant, Defendant failed to disclose that he was cash-poor and unable to finance or sustain the ultra-luxury lifestyle that he led. For example, in June 2021,

Defendant and a non-party jointly purchased a residence in which Defendant would reside in the exclusive enclave of Bal Harbour in Miami Beach, Florida. In connection with this transaction, Defendant agreed to pay the non-party a total of $2,255,023.57 through 21 weekly installments of $100,000 beginning on October 12, 2021, with the remaining balance due on March 15, 2022. To secure Defendant's payment obligations, Defendant executed an affidavit of confession of judgment in favor of the non-party in the amount of $2,255,023.57.

19. This approximate $2.3 million debt represents only a fraction of the money that Defendant owed, and continues to owe, to non-parties that Defendant has accrued in an attempt to maintain a well-heeled lifestyle that he simply cannot afford.

20. Rather than abate his careless spending, Defendant doubled down by deciding to turn Plaintiff into his personal piggy bank.

21. Defendant implemented his strategy through four primary methods.

22. First, Defendant falsely held himself out to numerous clients as an owner of Plaintiff and diverted payments intended for Plaintiff to himself. Defendant accomplished this by improperly directing such companies to make payments directly to him of the future receivables that Plaintiff had purchased. Upon information and belief, certain of Plaintiff's customers, including Jecov Freight Forwarding, LLC, Valley Manor LLC, Drosos and Associates PC, Premium 72 Capital, LLC, and RIS Construction Corp., were induced by Defendant's false and fraudulent representations that he owned Plaintiff to make payments in excess of $500,000 to Defendant, instead of to Plaintiff, who is lawfully entitled to the payment of such funds.[1]

---

[1] Plaintiff's investigation into Defendant remains ongoing and discovery will likely reveal that Defendant defrauded many other of Plaintiff's clients into wrongfully paying to Defendant millions of dollars rightfully due and owing to Plaintiff.

23. Defendant went so far as to tell certain of Plaintiff's customers to deal with him and not Herbst because, Defendant falsely claimed, Herbst worked for Defendant and was merely an accountant.

24. In another transparent bid to defraud Plaintiff's customers into making payments to Defendant instead of Plaintiff, on or around May 13, 2021 and January 14, 2022, Defendant registered two entities he controls, first Quick Capital Inc. and then City Capital NY LLC, to conduct business under the assumed name of "Hi Bar Capital." This way, upon information and belief, Defendant could direct Plaintiff's customers to make payment to "Hi Bar Capital" – Plaintiff's legal name – while providing wiring instructions for the bank account of either Quick Capital Inc. or City Capital NY LLC, each "doing business as" Hi Bar Capital. Thus, Defendant would fraudulently induce Plaintiff's customers into wrongly believing they were making payments to Plaintiff, when, in reality, the money would go to entities controlled solely by Defendant.

25. Next, Defendant unlawfully bolstered the commissions he claimed that Plaintiff owed him by causing Plaintiff to enter into transactions worth in excess of $6 million with nearly defunct companies teetering on the edge of insolvency that were nearly certain to **not** generate collectible future receivables and, thus, leave Plaintiff not only without profit, but with 100% losses on its purchases.

26. For example, Defendant caused Plaintiff to purchase $1.4 million of future receivables from Fruit Street Health, Inc. ("Fruit Street"), despite the fact that Fruit Street was mired in debt and days away from defaulting on its obligations and ceasing business operations. While Defendant knew, or should have known, that causing Plaintiff to purchase Fruit Street's

future receivables was a recipe for financial disaster, Defendant bulled ahead with the transaction in order to demand that Plaintiff pay Defendant a commission for brokering the deal.

27. While Plaintiff's investigation is ongoing, Defendant, upon information and belief, improperly caused Plaintiff to pay him approximately $1,000,000 in purported commissions for deals that Defendant knew, or should have known, would end up causing Plaintiff significant, if not total, losses.

28. Third, Defendant deceived Plaintiff and Herbst by extending and increasing existing transactions to make it appear as if Plaintiff had collected receivables, despite no such funds being paid to Plaintiff, in order to defraud Plaintiff into paying Defendant based on non-existent profits.

29. For example, if Plaintiff previously purchased $150,000 of future receivables from a company, but only collected $50,000 of such company's receivables, Plaintiff would not yet have earned a profit on that transaction. To the contrary, Plaintiff would need to receive another $100,000 just for the deal to break even. In such case, Defendant would offer the company to extend the transaction and increase the amount of receivables that Plaintiff would purchase by, for example, an additional $100,000. Thus, if properly journaled, Plaintiff's books would reflect that the company had open balances to Plaintiff totaling $200,000 ($100,000 owed on the first transaction and $100,000 owed on the second transaction).

30. Not one to play by the book, Defendant instead played *with* the books by intentionally failing to properly account for such deals to Plaintiff. Indeed, Defendant would manipulate the first $100,000 transaction to falsely reflect a $0 balance, thus, providing Plaintiff the false impression that (i) the first transaction had closed, (ii) that Plaintiff fully collected all of the outstanding receivables; and (iii) that Plaintiff earned a profit. Defendant then used this

fabricated accounting to defraud Plaintiff into making payments to Defendant based on non-existent profits.

31. Defendant, upon information and belief, implemented this fraudulent scheme on numerous occasions and unlawfully caused Plaintiff to pay to him in excess of $3 million.

32. Finally, Defendant simply extorted Plaintiff. Any time Defendant had an immediate need for cash to finance his lavish and luxurious lifestyle, Defendant demanded that Plaintiff pay to him an "advance" of Defendant's anticipated future commission payments and threatened to destroy and derail Plaintiff's business if Plaintiff resisted. Indeed, Defendant once threatened Herbst that he "will make sure all deals go bad on you."

33. For example, in October 2021, Defendant demanded that Plaintiff "advance" Defendant over $2.2 million in weekly $100,000 payments so that Defendant could make the payments he owed on the ultra-luxury Bar Harbour mansion he had purchased. When Plaintiff resisted, Defendant threatened to immediately (i) tell Plaintiff's existing customers to stop making payments on receivables; (ii) stop collecting any receivables on Plaintiff's behalf; and (iii) stop bringing any deals to Plaintiff and, instead, outsource them to competitors from whom Defendant could receive a commission.

34. Faced with the immediate threat of the complete destruction of its business, Plaintiff agreed to pay the "advances" to Defendant. However, it soon became clear that the "advances" Defendant demanded were nothing of the sort as Defendant refused to credit these payments against earned profits and continued to demand that Plaintiff pay him amounts that failed to acknowledge the significant advances made to Defendant. Thus, Defendant demanded to Plaintiff double-pay him completely unwarranted sums.

35. Plaintiff subsequently learned of the foregoing wrongdoing and is presently attempting to remedy Defendants' breaches and misconduct, repair relationships with its customers harmed by Defendants' lies, fraud and deception, and prevent Defendant from stealing further millions from Plaintiff and others.

## AS AND FOR A FIRST CLAIM FOR RELIEF
**(Breach of Fiduciary Duty)**

36. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

37. As Plaintiff's agent, Defendant owed fiduciary duties of loyalty and good faith to Plaintiff.

38. Defendant breached his fiduciary duties by the disloyal conduct more fully described above, including, among other things, converting funds rightfully due and owing to Plaintiff for his own personal benefit, deceiving Plaintiff concerning the status of business transactions to fraudulently obtain unwarranted payments from Plaintiff, and knowingly causing Plaintiff to enter into financially unsound transactions solely to allow Defendant to receive commissions to which Defendant was otherwise not entitled.

39. Defendant's disloyal conduct substantially violated the parties' agreement such that it permeated Defendant's service in its most material and substantial part and constituted a breach of Defendant's duty of loyalty and good faith to Plaintiff.

40. By reason of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, but in no event less than $10.5 million, plus (i) disgorgement of all compensation paid to Defendant by Plaintiff during the period of Defendant's disloyalty and (ii) disgorgement by Defendant to Plaintiff of all profits made by Defendant during the period of disloyalty, along with costs, interest, expenses and attorneys' fees.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Contract)

41. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

42. As set forth above, the parties entered into a contract pursuant to which Defendant, among other things, would source deals for Plaintiff and conduct the day-to-day operations of Plaintiff's business in exchange for receiving a commission of 50% of net profits earned by Plaintiff.

43. As set forth above, Plaintiff fully performed under the parties' contract.

44. As set forth above, Defendant breached the parties' contract

45. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Conversion)

46. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

47. As set forth above, Plaintiff owns and has a property right in its profits and accounts receivables and has a right of possession to such funds that is superior to Defendant's right of possession.

48. As set forth above, Defendant has no right to possess the funds that Defendant has pilfered from Plaintiff.

49. As set forth above, Defendant's wrongful and intentional conduct dispossessed Plaintiff of its funds to the exclusion and denial of Plaintiff's rights and Defendant has converted such funds.

50. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

### **AS AND FOR A FOURTH CLAIM FOR RELIEF**
**(Money Had and Received)**

51. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

52. As set forth above, Defendants received in excess of $10.5 million belonging to Plaintiff and Defendant has benefitted from receipt of Plaintiff's money.

53. In the alternative that the Court does not find that a contract existed between Plaintiff and Defendant, the Court should find that principles of equity and good conscience do not permit Defendants to retain the over $10.5 million paid by Plaintiff.

54. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

### **AS AND FOR A FIFTH CLAIM FOR RELIEF**
**(Unjust Enrichment)**

55. Plaintiff repeats, reiterates, and re-alleges each and every allegation as contained in the above paragraphs with the same force and effect as if fully set forth herein.

56. As set forth above, Defendant has been unjustly enriched at Plaintiff's expense.

57. In the alternative that the Court does not find that a contract existed between Plaintiff and Defendant, the Court should find that principles of equity and good conscience do not permit Defendant to retain the over $10.5 million paid by Plaintiff.

58. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but in no event less than $10.5 million, plus costs, interest, expenses and attorneys' fees.

## JURY DEMAND

Plaintiff demands a jury trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby requests that the Court grant the following relief:

a. Judgment in Plaintiff's favor and against Defendant in an amount to be determined at trial, but in no event less than $10.5 million, plus disgorgement of compensation and profits, and pre-judgment interest;

b. Plaintiff's costs and disbursements incurred in this suit;

c. Plaintiff's attorneys' fees to the full extent permitted by law; and

d. Any such other and further relief as the Court may deem just and proper.

Dated: New York, New York
March 29, 2022

By: s/ *Glen Lenihan*
Terrence A. Oved, Esq.
Darren Oved, Esq.
Glen Lenihan, Esq.
Jonathan A. Lynn, Esq.
OVED & OVED LLP
*Attorneys for Plaintiff*
401 Greenwich Street
New York, New York 10013
Tel:  212.226.2700
terry@oved.com
darren@oved.com
glenihan@oved.com
jlynn@oved.com