# OPERATING AGREEMENT

# OF

# Hi Bar Capital LLC,

# A NEW YORK LIMITED LIABILITY

# COMPANY

Operating Agreement, dated as of January 18, 2021, by and between the Persons who have executed the signature page(s) hereof as Members.

## WITNESSETH:

WHEREAS, the parties have formed a limited liability company (together with any successor limited liability company, the "Company") under the New York Limited Liability Company Law (the "Act") and upon the terms and conditions of this Agreement; and

WHEREAS, the Members wish to set forth their agreement as to how the business and affairs of the Company shall be managed and their rights and obligations with respect to the Company;

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the parties hereby agree as follows:

## ARTICLE I

Formation and Business of the Company

1.1     Formation. The Company was organized on February 9, 2021 in accordance with and pursuant to the Act.

1.2     Name. The name of the Company is Hi Bar Capital LLC. The Company may do business under that name and, as permitted by applicable law, under any other name determined from time to time by the Manager.

1.3     Purpose of the Company. The purpose of the Company is any legal purpose.

1.4     Principal Office. The Company's principal place of business shall be located at 2111 57th Street Brooklyn, NY 11204, or such other place determined from time to time by the Manager.

1.5     Term. The term of the Company shall commence on the date hereof and shall be of unlimited duration, unless the Company is earlier dissolved in accordance herewith and with the Act.

1.6     Members. The names, addresses, and Percentage Interests of the Members are set forth on Exhibit A attached hereto, as amended from time to time.

# ARTICLE II

## Definitions

The following terms, as used in this Agreement, shall have the following meanings (unless otherwise expressly provided herein):

2.1     "Act" shall have the meaning set forth in the preamble of this Agreement.

2.2     "Affiliate" of a Person shall mean any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person, or an officer, director, partner or trustee of such Person. For purposes of this definition, "control" shall mean the right or ability to elect the majority of the directors of a corporation, to exercise more than fifty percent (50%) of the voting rights in the controlled entity or otherwise to direct the management or policies of the controlled entity.

2.3     "Agreement" shall mean this Operating Agreement, as originally executed and as amended from time to time in accordance herewith and with the Act.

2.4     "Capital Contribution" of, or attributed to, an Member shall mean the total contributions to the capital of the Company, whether in cash, property (net of liabilities) or services, made, performed or to be performed by, or attributed to, such Member {, to the extent actually performed}, valued on the date of contribution or commitment to contribute as set forth {herein} {in the Company's books and records}.

2.5     "Cash Available for Distribution," as of any date, shall mean the excess of (a) all revenues received by the Company from its operations and investments over (b) total current operating expenses and reasonable reserves for future operating expenses, including payments in respect of indebtedness of the Company, capital improvements and contingencies, as determined from time to time by the Managers.

2.6     "Code" shall mean the Internal Revenue Code of 1986, as amended, in effect as of the date hereof and as amended from time to time hereafter.

2.7     "Company" shall have the meaning set forth in the preamble to this Agreement.

2.8     "Economic Interest" shall mean a Person's share of the Profits and Losses of, and the rights to receive Distributions from the Company

2.9     "Economic Member" shall mean any Person with an Economic Interest whether as a Member or as an assignee of the Member.

2.10     "Fiscal Year" shall mean the Company's accounting, tax and fiscal year, which shall be the calendar year.

2.11     "Initial Capital Contribution" of a Member shall mean its initial contribution to the capital of the Company pursuant to this Agreement.

2.12     "Interest" shall mean any of a Management Interest and/or Membership Interest.

2.13     "Majority in Interest" shall mean the Members holding more than fifty percent (50%) of the aggregate Percentage Interests held by all Members.

2.14     "Manager" or "Managers" shall mean those charged with the management of the Company as set forth in Article V. Specifically, "Manager" shall mean Yisroel Herbst.

2.15     "Management Interest" of a Member shall mean his or its right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in, any decision or action of or by the Members hereunder or under the Act.

2.16     "Member" shall mean each Person who (a) executes a counterpart of this Agreement as a Member as of the date hereof or (b) is admitted as a Member after the date hereof in accordance herewith, provided that, in each case, a Member shall always have a Management Interest

2.17     "Membership Interest" shall mean a Member's entire interest in the Company, including his or its Economic Interest (to the extent not Transferred) and Management Interest.

2.18     "Member-Manager" shall mean a Manager who is also a Member.

2.19     "Member Nonrecourse Debt" shall mean nonrecourse debt of the Company under Treas. Reg. Section 1.704-2(b)(4).

2.20     "Member Nonrecourse Deductions" shall mean the losses, deductions and expenditures attributable to Member Nonrecourse Debt under Treas. Reg. Section 1.704-2(i)(2).

2.21     "Negative Capital Account" shall mean a Capital Account with a balance less than zero.

2.22     "Net Profits" and "Net Losses" shall mean, for each Fiscal Year or other period for which they are determined, the income and gain, and the losses, deductions of the Company, respectively, in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles consistently applied.

2.23     "Percentage Interest" of a Member shall mean his or its percentage share of the Net Profits, Net Losses, other regularly allocable items and distributions of the Company, as set forth on Exhibit A attached hereto, as amended from time to time.

2.24     "Person" shall mean any individual, partnership, limited liability company, corporation, joint venture, trust, association or any other entity, domestic or foreign, and its respective heirs, executors, administrators, legal representatives, successors and assigns where the context of this Agreement so permits.

2.25      "Transfer" shall mean any sale, assignment, transfer, gift, exchange, bequest or other disposition of an Interest, in any manner, voluntary or involuntary, by operation of law or otherwise.

2.26      "Transferor" shall mean any Member which Transfers, or proposes to Transfer, an Interest.

2.27      "Treasury Regulations" or "Treas. Reg." shall mean regulations promulgated under the Code in effect as of the date hereof or hereafter amended or adopted.

2.28      "Voluntary Withdrawal" of a Member shall mean his or its withdrawal as a Member as a result of an event described in Section 2.30 (f), (g) or (h).

2.29      "Withdrawal Event," with respect to any Member, shall mean his or its (a) death, revocation of its certificate of incorporation, dissolution, expulsion as a Member or adjudication of incompetency, as applicable; (b) Bankruptcy; {(c) making a general assignment for the benefit of creditors; (d) failure to pay his or its debts as they become due, or admission of inability to pay his or its debts as they become due; (e) Interest becoming subject to the enforcement of rights of any of his or its creditors, unless such rights are released within {ninety (90)} days after he or it receives notice of the creditor's action;} (f) voluntary retirement or withdrawal from the Company; {(g) except as otherwise provided herein, breach of any of his or its material obligations under this Agreement} or (h) any other event that terminates a Member's membership in the Company or otherwise causes the dissolution of the Company under the Act.

## ARTICLE III

Capital Contributions
and Capital Accounts

3.1      <u>Initial Capital Contributions</u>. On the date hereof, each Member shall contribute to the Company as its Initial Capital Contribution cash in the amount set forth in Exhibit A attached hereto.

3.2      <u>Additional Capital Contributions</u>. No Member shall be required to contribute any additional capital to the Company, unless required by either the terms of this Agreement or by the Manager.

3.4      <u>Capital Accounts</u>. The Company shall establish and maintain a Capital Account for each Member. The initial Capital Accounts shall be in amounts equal to the Members' Initial Capital Contributions. Subject to Section 3.3(b), An Member's Capital Account shall be increased by the amount of any additional Capital Contributions made by, and the income and gain allocated to, such Member, and shall be decreased by any losses and deductions allocated, or distributions made, to such Member pursuant to the terms of this Agreement. It is the intention of the Members that Capital Accounts be maintained strictly in accordance with Treas. Reg. Section

1.704-1(b)(2)(iv).No Member shall be paid interest on the balance of its Capital Account from time to time

3.5     Return of Capital Contributions. Except as otherwise provided in this Agreement, no Member shall have any right to demand or receive (a) any cash or property of the Company in return of its Capital Contribution or in respect of its Membership Interest until the dissolution of the Company or (b) any distribution from the Company in any form other than cash.

3.6     Transfer of Interest. If an Interest is Transferred as permitted by this Agreement, the transferee shall succeed to the Capital Account of the Transferor to the extent the Capital Account relates to the Transferred Interest in accordance with Treas. Reg. Section 1.704-1(b)(2)(iv)(*l*).

# ARTICLE IV

## Distributions and Allocations

4.1     Distributions. Cash Available for Distribution shall be distributed periodocally to each Member in accordance with its Percentage Interest.

4.2     Limitation on Distributions. No distribution shall be declared and paid unless, after giving effect thereto, the assets of the Company exceed the Company's liabilities.

4.3     Allocations of Net Profits and Net Losses. Except as otherwise required by the Code or as provided in this Agreement, the Net Profits and Net Losses for each Fiscal Year shall be determined in accordance with the accounting methods followed by the Company for federal income tax purposes.

4.4     Qualified Income Offset. Notwithstanding anything in this Article IV to the contrary, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. Section 1.704-1(b)(2)(ii) (d)(4), (5) or (6) which cause a deficit or increase the deficit in the Member's Capital Account, items of Company gross income and gain shall be allocated to the Member in an amount and manner sufficient to eliminate the deficit in its Capital Account as quickly as possible; provided, however, that for this purpose, a Capital Account shall be increased by the Member's share of Company Minimum Gain as of the end of the Fiscal Year. It is the intention of the Members that this Section 4.4 be treated as a "qualified income offset" within the meaning of Treas. Reg. Section 1.704-1(b)(2)(ii)(d).

4.5     Minimum Gain.

(a)     Nonrecourse Deductions. Member Nonrecourse Deductions shall be allocated to the Member that bears the economic risk of loss with respect to the debt to which such Member Nonrecourse Deduction is attributable.

(b)     Distributions of Nonrecourse Financing Proceeds. If the Company makes a distribution to the Members that is allocable to the proceeds of any nonrecourse liability of the Company, or of any other entity in which the Company has an interest, such distribution shall be

allocable to an increase in Company Minimum Gain as provided in Treas. Reg. Sections 1.704-2(h) and (i)(6).

(c)        Company Minimum Gain. Each Member's share of Company Minimum Gain shall be determined as provided in Treas. Reg. Sections 1.704-2(g) and (i)(5).

(d)        Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain for a Fiscal Year, items of Company income and gain shall be allocated to the Capital Accounts as provided in Treas. Reg. Section 1.704-2(f). Notwithstanding the foregoing, to the extent such net decrease is attributable to a Member Nonrecourse Debt, then any Member with a share of the minimum gain attributable to such debt shall be allocated items of income and gain as provided in Treas. Reg. Section 1.704-2(i)(4).

4.5        Allocation of Nonrecourse Liabilities. For purposes of Treas. Reg. Section 1.752-3(a), the Members' interests in Net Profits shall be their respective Percentage Interests.

4.6        Tax Returns and Other Elections. The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all applicable laws of each jurisdiction in which the Company does business. Copies of all such returns, or summaries thereof, shall be furnished to the Members within a reasonable time after the end of each Fiscal Year.

# ARTICLE V

## Managers

5.1        Management and Authority.

(a)        The property, business and affairs of the Company shall be managed by its Managers. Except where the Members' approval is expressly required by this Agreement or by the Act, the Managers shall have full authority, power and discretion to make all decisions with respect to the Company's business and to perform such other services and activities as set forth in this Agreement. Every Manager shall be an agent of the Company for its business purposes and each Manager may bind the Company in the ordinary course, provided that the Managers have approved such action in accordance with this Agreement or the Act. Unless otherwise expressly authorized by this Agreement or the Members as set forth herein, the act of a Manager that is not apparently for carrying on the Company's business in the ordinary course shall not bind the Company.

(b)        Except as otherwise expressly provided in this Agreement or the Act, the Members shall have no right to control or manage, nor shall they take any part in the control or management of, the property, business or affairs of the Company, but they may exercise the rights and powers of Members under this Agreement, including, without limitation, the right to approve certain matters as provided herein.

5.3        Certain Powers of Managers. Without limiting the generality of Section 5.1, the Managers shall have the power and authority, on behalf of the Company and any other entity controlled by the Company (a "Controlled Subsidiary"), to:

(a)	acquire property in the ordinary course of the Company's business from any Person

(b)	purchase life, liability and other insurance to protect the Company's property and business;

(c)	establish bank accounts in the name of the Company and establish the identity of all signatories entitled to draw against such accounts for the benefit of the Company;

(d)	employ, and fix the terms of employment and termination of employment of, employees of the Company, and accountants, legal counsel and consultants for the Company

(e)	invest Company funds in time deposits, short-term governmental obligations, commercial paper or other similar investments or in any other capital asset or investment in the ordinary course;

(f)	execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition or disposition of the Company's property, assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company and relating to transactions that have been approved in accordance with this Agreement;

(g)	borrow money for the Company in the ordinary course, on a secured or unsecured basis, from banks or any other Person including Members, Managers or Affiliates of any thereof;

(h)	enter into any and all other agreements on behalf of the Company with any other Person including Members, Managers or Affiliates of any thereof, for any purpose in the ordinary course, in such forms as the Managers may approve;

(i)	institute, prosecute and defend legal, administrative or other suits or proceedings in the Company's name;

(j)	establish pension, benefit and incentive plans for any or all current or former Members, Managers, employees, and/or agents of the Company, on such terms and conditions as the Managers may approve, and make payments pursuant thereto; and

(k)	do and perform any and all other lawful acts as may be necessary or appropriate to conduct the Company's business.

5.9	Execution of Documents.

(a)	Except as otherwise determined by the Managers or the Members or as set forth herein or in the Act, any document or instrument may be executed and delivered on behalf of the Company by any Manager, including, without limitation, any deed, mortgage, note or other evidence of indebtedness, lease, security agreement, financing statement, contract of sale or other instrument purporting to convey or encumber, in whole or in part, any or all of the assets of the Company at any time held in its name, or any compromise or settlement with respect to accounts

receivable or claims of the Company; and, subject to the authorization requirements set forth herein or in the Act, no other signature shall be required for any such instrument to bind the Company.

# ARTICLE VI

## Rights and Obligations of Members;

6.1     <u>Liability for Company Debt</u>. No Member will be personally liable for any debts, losses or obligations of the Company by reason of its being a Member, except to the extent of its Capital.

6.2     <u>Meetings of Members</u>.

(a)     The Members will meet annually upon request by the Managers for the purpose of transacting such business as may come before the meeting at the principal office of the Company, or at such other time or place within or without the State of New York as shall be determined by the Managers.

# ARTICLE VII

## Transferability

If transfers, including transfers of financial rights only, are permitted only by consent:

7.1     <u>General</u>. Except as otherwise specifically provided in this Agreement, no Member shall have the right to Transfer any Interest to a non-Member without the consent of the remaining Members which may be withheld for any reason or no reason, in its or their sole discretion. Upon the Transfer of all of a Member's Economic Interest, the Transferor shall cease to be a Member.

# ARTICLE VIII

## WITHDRAWAL OF MEMBERS

8.1     <u>No Voluntary Withdrawal</u>. A Member shall have no right or power to surrender his or its Membership Interest voluntarily or otherwise take, or permit to be taken, any action that would constitute a Voluntary Withdrawal.

8.2     <u>Involuntary Withdrawal</u>. Immediately upon the occurrence of an event listed in 2.30 (a)(b)(c)(d)(e), the successor of the withdrawn Member shall thereupon become an Economic Member, but shall not become a Member.

# ARTICLE IX

## Dissolution and Termination

9.1    <u>Events Causing Dissolution and Winding-up</u>. The Company shall be dissolved and wound up upon the first to occur of the following events:

(a)    the written consent of the Managers

(b)    the sale or other disposition of all or substantially all of the business or assets of the Company;

9.2    <u>Winding up of the Company</u>.

(a)    If the Company is to be dissolved in accordance with Section 9.1, then the Managers shall wind up the affairs of the Company, including by selling or otherwise liquidating the Company assets in a bona fide sale or sales to third Persons at such prices and upon such terms as they may determine.

(b)    The proceeds of any liquidation of the Company shall be distributed in the following order of priority (to the extent that such order of priority is consistent with the laws of the State of New York):

(i)    first, to the payment of the debts and liabilities of the Company and the expenses of dissolution and liquidation;

(iii)    then, to the Members as set forth in this Agreement.

{9.4} <u>Articles of Dissolution</u>. Within ninety (90) days following the dissolution and the commencement of winding up of the Company, Articles of Dissolution shall be prepared, executed and filed in accordance with the Act.

# ARTICLE X

## Indemnification

10.1    <u>Indemnification</u>. To the fullest extent permitted by applicable law from time to time in effect:

(a)    the Company shall indemnify and hold harmless the Manager, Members , officers, agents and employees of the Company and their respective directors, trustees, shareholders, partners, officers, employees, agents and other Affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees and disbursements, and damages (collectively, "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

# ARTICLE XI

## Miscellaneous Provisions

11.1    <u>Notices</u>. Except as otherwise set forth herein, any notice, demand or communication required or permitted to be given under this Agreement shall be (a) in writing, (b) delivered by hand, nationally recognized overnight courier service or facsimile, addressed to a party at its mailing address , and (c) deemed to have been given on the date delivered by hand or sent by facsimile or one business day after deposit with such courier service.

11.2    <u>Books of Accounts and Records</u>.

(a)    At the expense of the Company, the Managers shall maintain at the Company's principal place of business, records and accounts of all operations and expenditures of the Company, including, without limitation, the following records:

(i)    a current list in alphabetical order of the name and mailing address of each Member and, with respect to the Members, their respective shares of Net Profits and Net Losses, or information from which such shares can be derived;

(ii)    a copy of the Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any such amendment was executed;

(iii)    copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent Fiscal Years;

(iv)    copies of this Agreement, as in effect from time to time;

(v)    any writings or other information with respect to each Member's obligation to contribute cash, property or services to the Company, including, without limitation, the amount of cash so contributed and a description and statement of the agreed-upon fair market value of property or services so contributed or to be contributed;

(vi)    any financial statements of the Company for the three most recent Fiscal Years;

(b)    Upon reasonable advance notice, during normal business hours, any Member or its representatives may, at its expense, inspect and copy the records described in Section {11.2(a)} for any purpose reasonably related to such Person's Interest.

11.3    Application of New York Law. This Agreement, and the application or interpretation hereof, shall be governed by and in accordance with the laws of the State of New York applicable to agreements made and fully to be performed therein, and specifically the Act.

11.4    Amendments.

(a)    Except as otherwise required by this Agreement or the Act, this Agreement may be amended by the affirmative vote of all of the Members.

(b)    Notwithstanding anything to the contrary contained in this Agreement, the Managers may modify the provisions of this Agreement without the consent of the Members if, upon advice of counsel to the Company, the modification is necessary to cause (i) the Company to be or to continue to be classified as a partnership for federal income tax purposes or (ii) the allocations under Article IV to have substantial economic effect or to be in accordance with the Members' interests under Section 704 of the Code and the Treasury Regulations thereunder. No modification hereunder may alter the limited liability of the Members or have a material effect on amounts distributable to any Member pursuant to this Agreement.

11.5    Amendment by Agreement of Merger. Notwithstanding anything to the contrary contained in this Agreement, in accordance with Section 1004(e) of the Act, an agreement of merger or consolidation approved by the Members as required by this Agreement may effect (a) amendments to this Agreement contained in the agreement of merger or consolidation or necessitated thereby or (b) the adoption of a new operating agreement for the Company if it is the surviving or resulting entity, in each case without further action by the Members.

11.6    Execution of Additional Instruments. Each Member hereby agrees to execute such other and further documents and instruments, including, without limitation, statements of their Interests and powers of attorney, as necessary to comply with applicable law or otherwise as reasonably requested by the Managers.

11.7    Construction. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the neuter gender shall include the feminine and masculine genders and vice versa.

11.8    Headings. The headings in this Agreement are for convenience only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any of its provisions.

11.9    Waivers; Rights and Remedies Cumulative. The failure of any party to pursue any remedy for breach, or to insist upon the strict performance, of any covenant or condition contained in this Agreement shall not constitute a waiver of any such right with respect to any subsequent breach. Except as otherwise expressly set forth herein, rights and remedies under this Agreement are cumulative, and the pursuit of any one right or remedy by any party shall not preclude, or constitute a waiver of, the right to pursue any or all other remedies. All rights and remedies provided under this Agreement are in addition to any other rights the parties may have by law, in equity or otherwise.

11.10    Severability. If any provision, or portion thereof, of this Agreement, or its application to any Person or circumstance, shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement, such provision and their application shall not be affected thereby, but shall be interpreted without such unenforceable provision or portion thereof so as to give effect, insofar as is possible, to the original intent of the parties, and shall otherwise be enforceable to the fullest extent permitted by law.

11.11    Successors and Assigns. All of the covenants, terms, provisions and agreements contained in this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and permitted assigns.

11.12    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

11.17 Entire Agreement. This Agreement, and the Articles of Organization, embody the entire understanding and agreement between the Members concerning the subject matter hereof and supersede any and all prior negotiations, understandings or agreements with respect thereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement as of the date first above written.

Yisroel Herbst

By: _____

Name: Yisroel Herbst

Title: Member

## Exhibit A

| Member | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Yisroel Herbst | $1.00 | 100% |